Case number 14-1419 Borman LLC v. 18718 Borman LLC et al. Arguments not to exceed 15 minutes per side. Mr. Hanley for the appellant. Good morning, your honors, my name is Greg Hanley and I represent the plaintiff appellant Borman LLC and if it please the court I'd like to reserve three minutes for rebuttal. Your honors, I think we all can agree that the marquee issue here is whether the non-recourse mortgage loan act that was enacted by the Michigan legislature on March 29, 2012 violates the U.S. Constitution's contract clause. Before we get to that issue, the court need not reach the constitutional issue unless there's a determination that under the particular facts and unique circumstances of this case the NMLA by its terms even applies to the transactions and loans at issue here. Why do we say that? Because the following events all had occurred prior to the enactment of the non-recourse mortgage loan act. The loan documents had been executed, the borrower had received all the loan funds, the borrower had defaulted under the loan documents, my client's predecessor in interest had foreclosed the mortgage securing the loan, and in fact the property had actually been sold via foreclosure sale. All of those events happened before the enactment of the NMLA. Now why is that important under these unique facts and circumstances? By its terms, the NMLA applies only to non-recourse loans in existence on, entered into, after the effective date of the NMLA, in other words, March 29, 2012. So in order to be a non-recourse loan, that's a term of art defined under the statute, the loan must contain, as of the effective date, provisions to the effect that the loan is without personal liability to the borrower beyond the borrower's interest in the property or other collateral security given for the loan. Well, why was that not the case as of March 29, 2012 with respect to this particular loan? There's a provision of the loan documents that says the non-recourse provisions of this loan become null and void and of no further force and effect when the borrower becomes insolvent or fails to pay its debts as they became due, all of which happened long before March 29, 2012. So what happens is... So there's an insolvency provision in the loan documents. Right. Right. Which is it? Well, under the terms of our loan documents, the non-recourse provisions become null and void and of no further force and effect if the borrower either becomes insolvent or fails to pay its debts as they become due. That's the language of the loan document. And that's what the Cherryland One case held was clear and unambiguous and resulted in a default under the loan documents. So what we're saying is because the borrower had defaulted under the Cherryland One decision, they clearly didn't pay the loan, that the non-recourse provisions fell away at that point. By the express terms of the loan documents, they became null and void and of no further force and effect. So therefore, on March 29, later on, 2012, when they enact the NMLA, this is not a loan that contains a non-recourse provision. The loan had already triggered to become a fully recourse loan as of the time of the enactment of the NMLA. And that's because they missed a payment? No, that's because they completely defaulted and failed to make any of the remaining payments due under the loan documents. There's no dispute that the borrower defaulted under the loan documents by failing to... How does that necessarily mean that that party is insolvent? Because that is the precise issue that the Michigan Court of Appeals decided in the Cherryland One, saying that the unambiguous provisions mean when they say you become insolvent or a result of not paying the mortgage or not paying your scheduled payments under that particular loan secured by the... Doesn't that make it somewhat circular, the argument? Well, no, because it's faithful to the actual provisions of the loan documents. And by the way, that's the... Well, let me just see if I understand this. A non-recourse loan means that if there is a default, there's going to be no liability for the difference. Is that not correct? No personal... That's right. The lender would have to look solely to the collateral to satisfy the debt and could not seek other sources of recovery, such as personal liability of the borrower, if it's a true non-recourse loan. So, and in fact... Well, this was at some point a true non-recourse loan. No, it was a loan that had recourse triggers. And so, and the question you're asking, Judge Daughtry, is a reasonable question. And in fact, it's the type of reaction that led to the enactment of the NMLA. Because all of these people were saying, this is not what we originally intended. We're not supposed to have liability under these circumstances. And what multiple courts said, Cherryland One, Judge Cleland in the district court said, we are bound by the clear and unambiguous provisions of your loan documents. And we hold, as a matter of law, that these provisions are clear and unambiguous. And therefore, these events constitute the type of default that would obviate the non-recourse nature of this loan. And there's no dispute that there was a hue and cry about that. But that is the law of the state of Michigan, even today. And that's why there was a need for a, in their view, there was a need for a legislative solution. But the issue has been decided by the Michigan courts as to whether these loan documents go recourse, fully recourse, under the precise circumstances that are presented here. And so that's what led to the NMLA. The district court, of course, did not agree with the arguments you're making here today. No. She disagreed with every one of them. Yes. So why don't you address which parts you think were wrong to encourage us to go that way? Well, I think that the critical point here is Judge Roberts said there was no substantial impairment. And she made that decision by looking at what she perceived to be the intent of the parties at the time of contracting. And what we believe... And she looked at the legislative intent with respect to the curative statute. Right. She looked at... And I think that that was in connection with the determination of whether there was a legitimate, significant, important public purpose in doing... But the threshold requirement is... We know that there was, that this was a concern of the Michigan legislature with respect to the failing economy and that it would be a worsening effect if this had not been enacted. Right. And do you disagree with the concept that this statute was meant to apply to the exact scenario presented here in your case? It was... Well, I don't believe it applies to this particular loan for the reasons I just stated. But it was intended to deal with the problem, the perceived problem, raised by this type of case and these loan documents. But what we're saying is, what are the circumstances under which the legislature, when they disagree with a court's interpretation of a private contract between private entities, to legislatively overturn that in the name of obviating some perceived catastrophe? And I say, first of all, there shouldn't be any circumstances. From the earliest days of the United States, there was the case that came out of Georgia after the Civil War where they passed a... A Georgia legislature passed an act that allowed you to turn in your property to obviate your debt without personal liability, arguing that there would be a republic of paupers in the aftermath of the Civil War if we didn't have this law. And the Supreme Court said, well, we can't perceive of something that could be more violative of the contract clause to vitiate a debt like this. But let's assume that in the abstract there are circumstances under which you can legislatively abrogate a private debt. There have to be circumstances that are... Actually, the court didn't view it as abrogating a private debt. It was a construction about these particular contracts. Was it not construing, not abrogating, just saying that that wasn't the contract? Are you talking about the lower court in this case? I'm sorry. The district court, right? No, I believe that the district court would agree that under Cherryland I, this is a debt that we can enforce absent the NMLA. So if the NMLA applies and you reject the other arguments that it doesn't apply, then it clearly means we can't recover. And so what we're saying is there has to be a compelling, demonstrable public reason, the greater good, to abrogate this debt. And what we're saying is all we had are some sort of anecdotal testimony, 23 pages of testimony that talked about how there was going to be the destruction of commercial lending in the state of Michigan, total destruction of the state of lending. Now, I might be able to buy that if we were talking about it didn't have retroactive application and it was going forward. In other words, lenders wanted to know that these provisions would be enforced as it was intended. So you can pass the NMLA. We have no quarrel with the legislature's right to enact a statute that says, going forward, people, you can have these provisions in your loan documents. They're against public policy. They are going to hurt lending. People aren't going to want to make loans. But what we have a problem with is applying it retroactively to vitiate. And there's been no... One would expect if there were billions of these loans out that were going to destroy commercial lending in the state of Michigan that someone other than my clients and a few others would have brought these type of cases. But there aren't any. And that's because the problem has been significantly overstated by people who are self-interested in trying to get out of their own private debts. And for that reason, and for others set forth in our briefing, we believe that it's unconstitutional even if it does apply, which we don't agree under the terms of this loan documents at issue. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Alan Green on behalf of the appellees. I'm just going to address, I think, three points, and they're all points that were raised by the appellants in this argument. First, with respect to the events that occurred here, all the events that occurred are the same events that occurred in the Cherryland 2 mortgage situation, which the Michigan Court of Appeals held that the law applied to that loan, was intended to apply to that loan, and precluded the claim in that loan. There is one different event, though, that didn't occur in Cherryland 2. The plaintiff here actually acquired this property after a foreclosure sale by auction, pursuant to terms where it was represented to the buyer that this was a non-recourse loan. And when the buyer purchased this property and admitted that they never read or looked at the loan documents, the NMLA was in effect. So they bought this property knowing the law in effect at the time. That's even different than Cherryland 2, which is a different case in that respect. Second, and I gathered, I think you picked up on this, is that Judge Roberts looked at extensive information with regard to the intent of the parties and whether or not this was a substantial impairment. Judge Roberts looked at the intent of the original parties. That would be the lender, the borrower, the parties that put this securities package together, the investors. She also looked at the intent of the law and the legislative history of the law, which there is a legislative history here. There was testimony. It was adopted unanimously by committee by both parties. There wasn't a single party that came into the legislature and objected to the law. Counsel indicated here just a moment ago, oh, this really isn't a problem because you do not see this flurry of litigation out there. The reason you don't do that is because the lenders, the big banks, actually believe that what the law has done is consistent with the intent of the parties. They made a bargain, and their bargain was, you know, you will pay more interest rates. You will put up letters of credit and other security, and you will create an entity that's going to only own this property and be bankruptcy remote. And for that and for those things, we're not going to go after you for a deficiency, unless you do something bad, which they call the bad boy acts. You engage in fraud or you're taking money from the property. And that was the bargain. Now, that doesn't sound like a bad bargain. So why would the legislature want to change this? Because what happened is that in one case in Michigan, well, actually two cases. Is this Cherry Land we're talking about? Right. In one case in Michigan and in a second case also in Michigan brought by the same lawyers, they construed a sentence in the mortgage to say that if you were to become insolvent and not pay your debts when due, the loan becomes a recourse loan. And what the legislature has said and what everybody else looks at is that's illusory because every loan would then become recourse. Because as soon as you don't pay your debt, if you don't have the money, you're insolvent. And it becomes particularly a concern in these CMBS loans because you're only allowed to own one asset. That's part of the loan transaction. So if the asset loses value because of recession or anything else or there isn't enough income from that asset to pay the debt, then you are insolvent. The loan becomes fully recourse. And what the legislature said here is that that is against public policy. That is an unfair trade practice. It's illusory.  That that would greatly impact the economy in the state of Michigan, the provision of jobs, investment in the state of Michigan, and they wanted to keep Michigan on the same footing as every other state in the nation that hasn't ruled this way. Well, you know, there is a problem, though, with legislation of this kind that is not perspective only. I mean, at least back in the day, there was a lot of controversy about legislatures passing anything that was retroactive or that even captured what was in the pipeline. Our Supreme Court has said on numerous occasions that retroactive legislation is appropriate. Again, it has to be supported by a proper legislative purpose. And here there was an extensive legislative purpose for this legislation. This legislation wasn't aimed at a particular transaction. It wasn't aimed at relieving debtors from liability. In this particular case, the loan remains valid. There is a loan. In this particular case, you're telling me that all it does is maintain what the parties intended in the first place? Exactly. It doesn't impair contract rights because it's only a one-off interpretation that they feared would become way more than a one-off. It's very narrow, and I think we use the term laser focus. It doesn't affect recourse lending in the state, no effect on that. Even with respect to non-recourse loans, it doesn't affect any of the other bargain for bad boy exceptions that can turn a recourse loan into a non-recourse loan. It simply says that with respect to a post-solvency requirement, that that cannot be enforced in the state of Michigan. And that's really the trigger, too. It's enforcement. This goes to the first argument. The legislature is very careful. It applies to a certain character of loan, and they refer to loan documents that contain certain provisions. These clearly do. That is part of the explanation that I think your opponent is sort of missing, is that the reading of those provisions together allows for a reasonable person to understand that this is not an impairment. Right, and this is really almost secondary, but an observation. You think about this. The big banks, some of whom I represent, are very capable of defending their rights, and they have the ability to do that. There wasn't a single lender that appeared in the Michigan legislature to oppose this law. There hasn't been a single lender that has filed an amicus brief or any other position. In fact, just the opposite. The organizations representing lenders have appeared and said they support this law because that was their intent. How about debtors? I mean, was there opposition by folks like? No. No, no. And what you have is a situation here where clearly the law also was intended to avoid windfall profits. And in this particular case, you have an entity that was not a lender, that did not foreclose on the property even, that bought the property after it was foreclosed upon at an auction where it was represented that it was a nonrecourse loan, never read the loan documents, thought that the property was worth a lot more than they paid. It had just been appraised at $4.5 million. So they paid $756,000 for a property when they knew the law was in effect that said they couldn't do what they're trying to do here today, and now they're asking for $6 million that they never lost or invested. And that's what the state was trying to prevent. And the impact for retroactivity is very important for numerous reasons. What the testimony before the legislature was is that there are millions of these loans in place in Michigan, and many of these loans are underwater in the sense that the property is worth less than the outstanding balance of the loan. If the insolvency provision applied, then all those loans would be deemed to be insolvent, they'd be in breach. That makes the pretty simplistic and hard to quarrel with point about the legislative intent and legislature's good reasons wouldn't normally hold up to impair a contract right. I mean, it has to be the interpretation aspect that saves this. Well, what they say is, I mean, what the Supreme Court says is, you know, you first look to see whether it's a substantial impairment. And this is where the lower court really focused here on what you just said, is this is not a substantial impairment. It was never the intent of the parties. No party has come in and said this was our intent. Even in the original Cherryland case, which we disagree with the original Cherryland One decision on how they interpreted the contract, but even in Cherryland One, they acknowledged the testimony of the lender in that case. The lender was not bringing that lawsuit. Just so you know, it says Wells Fargo Bank. That was a special servicer. That was not the lender. The lender testified we have no intent that this would be a recourse loan under these circumstances. But the court said in Cherryland One, which is what caused the legislature to act, is, you know, we're not, the language says what it says, and we're not going to save you from a bad bargain, even if the parties on both sides intended something different. But what Cherryland One failed to do is, they failed to honor two key points of contract interpretation. That is that you try to discern the intent of the parties, and number two, you take all the provisions of a contract and try to reconcile them so they make sense. They ignored all these other provisions of the contract, focused on one line, and said, well, that line says what it says, and therefore go to the legislature, everybody, and let them change the policy. And that's what happened. So I have nothing else unless you have questions specifically. Apparently not. Okay. Thank you very much. Thank you. It may be very well that Cherryland One was, as Mr. Green argues, wrongly decided. I'm not conceding that, but it is the law of the state of Michigan with respect to the interpretation of these provisions. You don't look at, you don't go back and ask the original lender, what did you think? You don't go back and ask the original borrower, what do you think? You glean that intent from the four corners of the document. And what the state courts of Michigan have said is that under these documents, and ours are functionally identical, it clearly and unambiguously provides for personal liability. So what there is here is a legislative reversal of a judicial determination as to the interpretation of a private contract. And it happens all the time when a court interprets a statute and the legislature says, well, that's not what we intended. So in order to address this judicial decision, we're going to amend the statute and we're going to make clear what we meant. And we have no quarrel with that. What happened here, however, is there was a private contract that was brought to the courts. It's more than that, isn't it, counsel? I mean, you have to acknowledge that you and your clients and everyone understood this to be non-recourse. And then look at this. We found this provision. It's the same thing that happened in Cherryland. So, I mean, it's not in the four corners of the documents there are conflicting messages, recourse, non-recourse. With all due respect, Your Honor, those arguments are equitable arguments. Like it's unfair for my clients to be able to avail themselves of a legal right that is clear in the document. Well, it isn't so clear. That's, I guess, what I'm wondering if you glean. That's the whole point of Cherryland, Your Honor, is Cherryland 1 says it's clear and unambiguous in the document that you can enforce the recourse provisions under the circumstance, the precise circumstances of this case. And if that wasn't the law of the State of Michigan, as announced by the courts, there would have been no need for the legislature to pass the NMLA. It's a brand-new statute. It's not amending a statute to reflect a judicial misinterpretation of the statute. It's passing a statute in order to say we disagree with the way the Michigan Court of Appeals interpreted a private contract. So the notion that we look at what people intended, that's water under the bridge under a state law precedent that is the Cherryland 1 decision. And for that reason, we'd ask that you reverse the district court. All right, thank you. The case is submitted. You may call the next case.